UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

IGOR BRIKMAN

                    Plaintiff,

     - against -

                                                              **PLAINTIFF DEMANDS**
                                                              **A TRIAL BY JURY**
WESTCHESTER MEDICAL CENTER ADVANCED
PHYSICIAN SERVICES, P.C., as well as ANGELICA PONIROS,
MAT GAWRONSKI, and GABBIE FRIED, *Individually,*

                    Defendants.

-------------------------------------------------------X

    Plaintiff IGOR BRIKMAN (hereinafter "Plaintiff" or "Plaintiff BRIKMAN") proceeding pro se, hereby complains of
Defendants, upon personal knowledge, as well as upon information and belief, by alleging and averring as follows:

## INTRODUCTION

1. This complaint presents the case of a committed and hardworking Ukrainian employee who, upon reaching the age of 40, was subjected to escalated discrimination and retaliation in a workplace increasingly characterized by hostility and prejudicial practices. The environment was rife with blatant discrimination, as evidenced by disparaging remarks targeting foreign-born and older employees, including statements like 'a lot of immigrants here, need to clean the place up' and 'too much old trash working here.' The plaintiff, suffering from cervical stenosis and anxiety, faced multiple violations of the Americans with Disabilities Act (ADA), particularly in the employer's persistent failure to provide necessary accommodations. Post-40, the plaintiff experienced intensified discriminatory conduct, including dismissive comments about their anxiety being a 'problem for the department' and insensitive directives to simply 'deal with it,' effectively stigmatizing a serious health condition as a burden. This period was marked by a pattern of excessive micromanagement, unfairly targeted investigations, retaliatory measures in response to the plaintiff's reports of discrimination and efforts to seek accommodations under the Americans with Disabilities Act (ADA) and the Family and Medical Leave Act (FMLA), culminating in a wrongful termination. Further exacerbating these issues were the department's hiring practices, which demonstrated a clear bias towards younger, US-born employees, leading to the systematic exclusion and replacement of older, foreign-born staff, including the plaintiff. These collective actions created and sustained a work environment steeped in hostility and discrimination, causing significant damage to the plaintiff's professional reputation, career prospects, and mental health.

2. Plaintiff BRIKMAN brings this action alleging that Defendants have violated Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621 to 634 ("ADEA"), the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 to 12213, the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, et seq. ("FMLA"), and the New York State Human Rights Law, New York State Executive Law §§ 296, et seq. ("NYSHRL").

3. Plaintiff BRIKMAN seeks damages to redress the injuries he has suffered as a result of being subjected to discrimination on the basis of his disability/perceived disability, age, national origin and the unlawful termination of his employment, on the basis of disability/perceived disability, age, national origin, and in retaliation for engaging in protected activities and exercising his rights under the Title VII, ADEA, ADA, FMLA, and NYSHRL.

## JURISDICTION AND VENUE AND PROCEDURAL PREREQUISITES

4. Jurisdiction of this court is proper under 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. §§ 2601, et seq., 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law, specifically Title VII.

5. Supplemental jurisdiction over the state law claim is conferred by 28 U.S.C. § 1367.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District and the Defendant conducts business herein.

7. Plaintiff exhibited due diligence by faxing a comprehensive EEOC complaint on June 8, 2022, documenting a series of discriminatory acts by the Defendant(s). Despite repeated follow-ups, Plaintiff was met with continuous uncertainty regarding the receipt of the complaint, with EEOC personnel advising Plaintiff to persist in follow-up efforts.

8. After persistent follow-ups and due to conflicting information received from the EEOC, Plaintiff was ultimately advised to submit a new complaint. EEOC representatives directed Plaintiff to condense the narrative, emphasizing that it was unnecessary to elaborate beyond a few instances of the alleged discriminatory actions. Plaintiff was expressly told that providing a succinct account would be sufficient and that all prior and forthcoming incidents would be incorporated and addressed by the EEOC during the intake interview.

9. Trusting in the veracity and authority of the EEOC's guidance, Plaintiff submitted a revised complaint on August 29, 2022, that included only a select few examples of the claimed discriminatory behavior, in compliance with the instructions received.

10. Contrary to the assurances provided, Plaintiff later discovered that the complaint filed with the EEOC was left incomplete. This misalignment between the EEOC's advisement and the subsequent handling of Plaintiff's complaint necessitated further amendments. Plaintiff was compelled to submit additional, detailed documentation to ensure the EEOC complaint accurately represented the full extent and context of the discriminatory conduct faced.

11. The resultant procedural delays and the need for corrective amendments arose from adherence to EEOC counsel, impacting the procedural timeline of the Plaintiff's filing. These developments, stemming from reliance on official guidance, were neither anticipated nor within the Plaintiff's control, underscoring a significant reliance on the EEOC's authority and expertise.

12. The Plaintiff received a Notice of Right to Sue from the EEOC on September 21, 2023; and, commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, the Plaintiff satisfied all of the procedural prerequisites for the commencement of the instant action.

## THE PARTIES

13. At all times relevant hereto, Plaintiff BRIKMAN was and is a resident of the State of New York.

14. Defendant WESTCHESTER MEDICAL CENTER ADVANCED PHYSICIAN SERVICES, P.C. ("WESTCHESTER MEDICAL") is a corporation duly existing pursuant to, and by virtue of, the laws of the State of New York.

15. Defendant WESTCHESTER MEDICAL maintains a principal place of business at Ambulatory Care Pavilion Westchester Medical Center 100 Woods Road Valhalla, NY 10595, where Plaintiff worked.

16. Upon information and belief, Defendant WESTCHESTER MEDICAL employs over 50 individuals on a full-time or full-time equivalent basis and thus is subject to all statutes upon which Plaintiff is proceeding herein.

17. At times relevant hereto, Plaintiff was an employee of Defendant WESTCHESTER MEDICAL.

18. Upon information and belief, Defendants ANGELICA PONIROS ("PONIROS") and GABBIE FRIED ("FRIED") were and are individuals residing in the State of New York, as well as employees of Defendant WESTCHESTER MEDICAL.

19. Upon information and belief, Defendant MAT GAWRONSKI ("GAWRONSKI") was and is an employee of Defendant WESTCHESTER MEDICAL. Defendant GAWRONSKI held the position of "Supervisor" and had similar authoritative responsibilities over Plaintiff's employment.

20. Defendant PONIROS held the position of "Clinical Manager" and subsequently "Director of Non-Invasive Cardiovascular Services", and had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision-making process.

21. Defendant FRIED held the position of "Vice President of Cardiovascular Services", and, as such, had the authority similar to PONIROS regarding Plaintiff's employment.

## **MATERIAL FACTS**

22. Plaintiff BRIKMAN began his full-time employment with WESTCHESTER MEDICAL on July 10, 2017. He served diligently in the capacity of a Vascular Technologist throughout the entirety of his tenure. At the inception of his employment, his base salary was approximately $80,000.

23. Based on his robust formal education, including a Bachelor's degree and a certificate from an accredited ultrasound program, as well as his extensive professional experience, Plaintiff BRIKMAN was exceptionally qualified for the role he held at Defendant WESTCHESTER MEDICAL. He has been a dedicated Vascular Technologist since 2006 and is dual registered in both vascular and general ultrasound, showcasing a broad and versatile skill set in his field.

24. Plaintiff BRIKMAN began his full-time employment with Westchester Medical under the immediate supervision of Karen Baral, his hiring manager.

25. At the outset of Plaintiff BRIKMAN's employment, Defendant PONIROS held the position of Clinical Manager within the Echocardiography Department and played no role in the hiring process of Plaintiff BRIKMAN.

26. In the spring of 2018, while engaged in his professional duties, Plaintiff BRIKMAN directly witnessed Defendant PONIROS making overtly discriminatory and harassing remarks, stating 'Yeah, a lot of immigrants here, got to clean the place up.' This statement, clearly targeting foreign-born employees, was not only discriminatory in nature but also created a hostile work environment for those employees. The aforementioned remark by PONIROS was indicative of a larger pattern of targeted misconduct against specific employee groups,

particularly those of immigrant descent and older staff members. Plaintiff BRIKMAN promptly reported this incident to his immediate manager, Karen Baral, and to his coworkers.

27. During a discussion with Plaintiff BRIKMAN, Baral, who had nearly 20 years of tenure at the company, shared her apprehensions about Defendant PONIROS's behavior in the workplace. She revealed that PONIROS had consistently challenged her authority, frequently criticized her management methods and undermined her decision-making processes. Baral expressed a feeling of being targeted due to her age and the traditional approaches she employed, which she believed PONIROS viewed as outdated. Baral confided that she felt in 'survival mode', fearing that PONIROS's actions were part of a strategy to replace her due to these factors. She advised Plaintiff to maintain a professional distance from Defendant PONIROS, cautioning him about her manipulative and discriminatory tactics.

28. In Spring 2018, Defendant PONIROS demonstrated unethical conduct by attempting to involve Plaintiff BRIKMAN in the testing of PVR machines without the knowledge or consent of his direct supervisor, Karen Baral. This action, which bypassed the established chain of command, seemed strategically aimed at undermining Baral's authority. Plaintiff BRIKMAN perceived this as a targeted effort by PONIROS to diminish Baral's influence in the department, exploiting her age and traditional management approach. This incident was symptomatic of a larger pattern of manipulative and hostile behavior by PONIROS.

29. Concurrently, Defendant PONIROS exerted continuous pressure on Plaintiff BRIKMAN to engage in activities outside the purview of established procedures, further challenging the transparency and oversight integral to Baral's management. PONIROS's insistence on forming an exclusive partnership with Plaintiff, circumventing Baral's supervision, was not only professionally inappropriate but also constituted a form of harassment. This conduct was reflective of PONIROS's broader agenda to marginalize and eventually replace Baral, contributing to the overall hostile and discriminatory environment.

30. After seeking counsel from his trusted vascular surgeon, Plaintiff BRIKMAN was advised to decisively extricate himself from Defendant PONIROS's improper advances and to steadfastly adhere to the procedures and oversight stipulated by Baral's management role.

31. Upon revealing Defendant PONIROS's maneuvers to Baral, Plaintiff BRIKMAN was coerced into a harsh dichotomy, forced to choose loyalty between Baral – the manager who entrusted him with his position – and Defendant PONIROS, whom Baral explicitly characterized as engaging in discriminatory and manipulative conduct.

32. Subsequently, Defendant PONIROS baselessly slandered Plaintiff BRIKMAN to colleagues, falsely alleging that he deliberately erased test patient data. These false allegations were made immediately after Plaintiff BRIKMAN had objected to Defendant PONIROS's biased practices.

33. In the beginning of 2018, Plaintiff BRIKMAN, executing improvements as directed by technical director Grace, faced unwarranted accusations by Defendant PONIROS of unauthorized system tampering, claims subsequently relayed to Baral, who later recognized the error and issued an apology.

34. The litany of Defendant PONIROS's transgressions, culminating in baseless accusations and manipulative behavior, cultivated an atmosphere rife with hostility and represented a systematic effort to retaliate against Plaintiff BRIKMAN, undermining his integrity and breaching his entitlement to a workplace devoid of discrimination and retaliatory malice.

35. Upon information and belief, during the same period in the spring of 2018, Defendant PONIROS, then serving as the Echo Manager, disclosed her ambitions to a colleague of Plaintiff BRIKMAN. PONIROS reportedly expressed her intent to soon manage the Vascular Lab and projected her ascent to a significant leadership role within the organization. These statements, as shared with Plaintiff BRIKMAN by his colleague, suggest a calculated plan by PONIROS to ascend within the organization, possibly at the expense of existing staff, including individuals like Baral who were in positions PONIROS aspired to hold. This insight into PONIROS's ambitions underscored her role in fostering a workplace environment marked by intimidation and manipulative behavior.

36. In the spring of 2018, Baral experienced an involuntary and forceful removal from her position.

37. Interim management took over, which consisted of Abigail Sorokin, director of operations, and Marie Yezzo, VP of Professional and Support Services.

38. In or around July of 2018, Danielle Maxwell was appointed as a manager, ostensibly to replace Baral. During this period, Defendant PONIROS took an active role in training Maxwell. However, it soon became apparent that PONIROS's involvement went beyond mere training; she effectively assumed total control over the management of the vascular lab. This shift in dynamics underscored PONIROS's strategic positioning and escalating influence within the organization, specifically in operational matters of the vascular lab, further consolidating her authority in this key area.

39. In or around July 2018, Defendant PONIROS engaged in discriminatory conduct in the presence of Plaintiff BRIKMAN and his colleague, Ty, by making ageist comments not only undermined the dignity of the workplace but also amounted to harassment, contributing to an environment of fear and intimidation.

40. During an informal discussion in the vascular room, a situation further illuminating the discriminatory culture fostered by Defendant Poniros occurred. When Ty inquired about Poniros's long-term career plans with the organization, Defendant Poniros, dismissively and derogatorily, stated she did not foresee a long tenure, citing her disdain with the phrase, 'there is too much old trash working here.' This explicit ageist comment, in its blatant disrespect and prejudice against older employees, not only compromised the integrity of the workplace but also reinforced a hostile work environment. Such remarks by Defendant Poniros underscore her engagement in discriminatory practices, contributing to the perpetuation of an intimidating and fear-driven atmosphere, particularly for the organization's senior members.

41. In early fall of 2018, Defendant PONIROS became Plaintiff BRIKMAN's direct manager and authorized him and his colleague Ty to independently manage their work assignments for the Poughkeepsie office. This was evidenced by Sorokin who had arranged this initial meeting.

42. Upon information and belief, in or around 2018, Defendant PONIROS's persistent ageist harassment and discriminatory training method pressured my vascular colleague, Pittle, age 62, into premature retirement from the organization; PONIROS's condescending remarks, notably stating the system was 'not suitable for her,' epitomize the hostile work environment endured by Pittle, and despite Pittle's repeated reports, the administration failed to take corrective action, leaving her grievances unaddressed.

43. In the fall of 2018, Defendant PONIROS and Maxwell introduced a discriminatory policy which overtly favored one gender over another. This policy was opposed by Plaintiffs BRIKMAN and his colleague, Ty, for its clear violation of Title VII's prohibition against sex discrimination. Despite their objections, they were dismissively informed that their perspectives were irrelevant, further exemplifying the discriminatory practices entrenched within the management.

44. In early October 2018, Plaintiff BRIKMAN witnessed Defendant PONIROS publicly reprimanding Alicia, a Latina colleague, in a manner that was not only overtly harassing but also demeaning, occurring in view of staff and patients, further perpetuating a culture of harassment and discrimination. This particular instance of harassment occurred in a context where it was closely preceded by the unjustified termination of another Latina employee, also at the hands of Defendant PONIROS.

45. In or around October 2018, following in-depth consultations regarding systemic deficiencies with the chief vascular surgeon and an office supervisor, Plaintiff BRIKMAN, driven by a sense of responsibility to safeguard his peers from persistent discriminatory practices, took proactive steps by contacting Abigail Sorokin via phone. During this call, he received explicit guidance to formally document these grievances and operational shortcomings in a detailed email.

46. Around October 22, 2018, exercising his rights under anti-discrimination statutes, Plaintiff BRIKMAN actively addressed the ongoing discriminatory practices by Defendant PONIROS. He detailed his concerns, which included issues of age discrimination, gender bias, and perceived harassment, in an email directed to key organizational figures: Abigail Sorokin, Director of Operations; Marie Yezzo, Vice President; and Maxwell. This communication was an essential step in highlighting and seeking redress for the discriminatory environment cultivated by Defendant PONIROS.

47. A few days after submitting an email detailing discriminatory practices as advised by Sorokin, Plaintiff BRIKMAN attended a meeting with Maxwell, Sorokin, and another manager, with the expectation that the organization would address and remedy the issues raised. However, en route to this meeting, Maxwell informed Plaintiff BRIKMAN that he should not have reported these matters, contradicting the guidance previously given by Sorokin and contributing to an environment that discouraged reporting and addressing discrimination and harassment issues.

48. Upon information and belief, Maxwell disclosed Plaintiff's confidential communication to Defendant Poniros.

49. On October 31, 2018, nine days after making a formal complaint against unlawful discrimination practices, Plaintiff BRIKMAN was inappropriately reprimanded by Defendant PONIROS for sharing vital system enhancements information, a responsibility explicitly assigned by the chief Vascular Surgeon.

50. On November 6, 2018, fifteen days after making a formal complaint against unlawful discrimination practices, Plaintiff BRIKMAN, adhering to established workplace escalation protocols which have been established for over five years, sought advice from Ana Mannini, his Carmel office supervisor, regarding a workflow-related issue.

51. Contrary to these established protocols, on November 7, 2018, Plaintiff BRIKMAN received an unjust reprimand from Maxwell, wrongly accusing him of failing to consult Defendant PONIROS, despite explicit instructions to contact PONIROS only for Valhalla office matters at that time.

52. The same reprimand also falsely cited non-existent prior counselings from October 5 and October 24, creating a misleading narrative. Upon information and belief, this reprimand by Maxwell was issued under the direction of Defendant PONIROS, evidencing a coordinated retaliatory response to Plaintiff's formal complaint against unlawful discrimination practices.

53. The series of baseless reprimands and fabricated counselings against Plaintiff BRIKMAN represent not only retaliatory behavior but also significant contributions to a hostile work environment. These punitive measures, devoid of legitimate basis, served to create an atmosphere of intimidation and fear, effectively deterring reasonable employees from engaging in protected activities due to the apprehension of facing similar retaliation.

This orchestrated pattern of adverse actions not only inflicted considerable mental distress on Plaintiff BRIKMAN but also signaled a chilling effect on workplace rights, discouraging others from reporting discrimination or asserting their protected rights under federal laws.

54. On November 9, 2018, eighteen days after making a formal complaint against unlawful discrimination practices, Defendant PONIROS, wrongfully accused Plaintiff BRIKMAN of traveling to another office location without authorization during work hours.

55. Plaintiff BRIKMAN immediately refuted these accusations, providing irrefutable evidence through a phone call, from the office landline, verifying his presence at the assigned location throughout the workday. During the phone conversation, Defendant PONIROS acknowledged her mistaken assumption that Plaintiff BRIKMAN had not engaged in any unauthorized travel, thereby clearing any misconception regarding the Plaintiff's whereabouts on that day.

56. Upon information and belief, Mannini, a foreign-born vascular supervisor nearing 60 years of age, experienced escalating condescending treatment and stress from Defendants PONIROS and Maxwell. This treatment intensified following Mannini's visible support of Plaintiff BRIKMAN in his opposition to PONIROS's discriminatory practices. The pattern of behavior observed in the workplace strongly suggested that Mannini's support for Plaintiff became known to Defendants, leading to her unjust termination by Maxwell. This incident is indicative of a broader pattern of retaliatory behavior within the organization, significantly contributing to the hostile work environment endured by Plaintiff BRIKMAN and his older, foreign-born colleagues.

57. Mitchell Mirtil, served as the Labor Relations Manager and then as Director of Labor Relations at Defendant WESTCHESTER MEDICAL. In her role, Mirtil was a key decision-maker in matters pertaining to employment relations, disciplinary actions, and grievance resolutions. As the designated HR contact for Plaintiff BRIKMAN, Mirtil's decisions and actions were central to the employment dynamics and dispute resolutions experienced by the Plaintiff.

58. On November 14, 2018, twenty-three days following his formal complaint against unlawful discrimination practices, Plaintiff BRIKMAN was issued a final warning by Defendant PONIROS, marking the first formal disciplinary action against him. This meeting, attended by Yezzo and Mirtil represented a clear act of retaliation in response to Plaintiff's complaint. The issuance of this final warning significantly contributed to the already hostile work environment, exacerbating Plaintiff BRIKMAN's mental distress. The resulting anxiety and headaches he suffered were direct consequences of this retaliatory measure, further evidencing the discriminatory and retaliatory culture perpetuated by the Defendants.

59. The warning issued against Plaintiff BRIKMAN stemmed from Defendant PONIROS's intentional dissemination of false and misleading information about the November 9th event, which was subsequently omitted from an official warning document, underscoring the deceptive nature of Defendant PONIROS's actions.

60. During the aforementioned meeting, it was revealed that Defendant PONIROS had wrongfully obtained and was in possession of Plaintiff BRIKMAN's original complaint, dated on or around October 22nd, which detailed allegations of discriminatory practices. This act represented a gross violation of the confidentiality that is fundamental to whistleblower protections under title VII and ADEA, thus directly exposing Plaintiff to retaliation and further discrimination.

61. In the warning document, Defendant PONIROS, in an evident act of retaliation, penalized Plaintiff BRIKMAN for exercising legally protected rights by falsely labeling Plaintiffs' engagement in federally protected whistleblowing activities as 'unprofessional behavior'.

62. Within the same meeting, this confidential whistleblowing email was read aloud to Plaintiff BRIKMAN, underscoring Defendants' use of intimidation and retaliation, including threats of termination.

63. In a striking example of unequal treatment during the final warning, Plaintiff BRIKMAN was discriminatorily reprimanded for a previously permissible action of exchanging work locations at an MHRH site, as authorized by Defendant PONIROS. Meanwhile, Ty, BRIKMAN's U.S.-born colleague involved in the same action, received no inquiry or reprimand from Defendant PONIROS. This differential treatment underscores a pattern of biased and selective policy application by Defendant PONIROS, indicative of retaliatory and discriminatory motives.

64. Despite the irrefutable evidence of Defendant PONIROS's intentional fabrication of false information leading to an unjust final warning against Plaintiff BRIKMAN, no disciplinary action was taken against PONIROS.

65. Within a year of these events, PONIROS was not only exonerated of any misconduct but was also inappropriately promoted to a directorial position, a privilege similarly extended to Maxwell.

66. These facts collectively paint a stark portrait of Defendants' systematic and malicious disregard for Plaintiff's legal protections against workplace discrimination and retaliation, violating the core principles of Title VII and the ADA, and exposing a culture of institutionalized bias within the Defendant's operations.

67. On November 15, 2018, Plaintiff BRIKMAN participated in a meeting with Yezzo and Defendant PONIROS. During this meeting, Plaintiff BRIKMAN provided a detailed rebuttal to each allegation made by Defendant PONIROS, demonstrating the falsity of such claims and asserting his position against these unwarranted and false accusations.

68. Defendant PONIROS was unable to furnish any credible evidence or rational justification for the allegations, revealing their unsubstantiated and retaliatory nature. This conspicuous absence of proof served as compelling evidence that the accusations were baseless, maliciously fabricated, and driven by discriminatory intent.

69. In or around December 2018, In December 2018, Plaintiff BRIKMAN sustained injuries from a motor vehicle accident leading to a diagnosis of cervical radiculopathy with MRI-confirmed cervical herniations, a condition necessitating medical intervention during non-work hours.

70. Plaintiff BRIKMAN, having adhered to a consistent work schedule from 8:30 am to 5:00 pm over an eighteen-month tenure, sought an ADA accommodation to modify the schedule for an early start and finish times in order to attend the prescribed physical therapy sessions.

71. Defendant PONIROS, upon receiving Plaintiff BRIKMAN's request for an adjusted work schedule to accommodate his medical therapy, not only refused the request but also altered Plaintiff BRIKMAN's work hours to a later schedule, directly conflicting with his necessary medical treatments and thereby exacerbating his medical condition. This action displayed a willful disregard for Plaintiff BRIKMAN's health and the reasonable accommodations mandated under the ADA.

72. Further exemplifying her retaliatory and discriminatory conduct, Defendant PONIROS demanded proof of Plaintiff BRIKMAN's medical condition by requesting to see his MRI results. Even upon reviewing these results, which clearly substantiated the necessity for medical treatment, she callously denied the request to adjust the work schedule or to swap shifts with willing colleagues. Moreover, she coercively mandated the use of sick leave for medical appointments, rather than providing the reasonable accommodation of a modified work schedule.

73. Defendant PONIROS, in a demeaning and harassing act, compelled Plaintiff BRIKMAN to remove his medically prescribed neck brace while in the presence of colleagues. She explicitly prohibited its use during work hours,

thereby subjecting Plaintiff to humiliation and exacerbating the hostility of the work environment. This action not only violated ADA protections but also directly aggravated Plaintiff's cervical radiculopathy condition, necessitating more frequent use of prescribed pain medication to manage the increased discomfort.

74. This act not only infringed upon ADA safeguards but also imposed undue humiliation and physical distress on Plaintiff BRIKMAN, thereby cultivating a hostile and discriminatory work environment.

75. In contrast to Plaintiff BRIKMAN's denied accommodations, Defendant PONIROS authorized a US-born colleague, Tara, who did not engage in any protected activities, to wear a walking boot for an ankle injury and adjusted her duties to prevent further harm, evidencing discriminatory favoritism and a retaliatory workplace environment.

76. Due to escalating hostility and punitive responses from Defendant PONIROS after seeking accommodations for cervical radiculopathy, Plaintiff BRIKMAN became apprehensive about requesting further adjustments. Fearing intensified retaliation, Plaintiff endured worsening health without additional accommodation requests, underscoring the oppressive and retaliatory work environment perpetuated by PONIROS.

77. In or around December 2018, Defendant PONIROS engaged in discriminatory practices based on age and national origin at WESTCHESTER MEDICAL.

78. Madjid, a foreign-born former employee over 60 years old with more than 15 years of professional experience, was deliberately excluded from the interview process. Similarly, Grace Moodie Wells, also foreign-born and over 50 years old with 20 years of experience in the practice, and having left on good terms, was not considered for an interview.

79. Contrary to the job's stated requirement of at least 5 years of expertise, Defendant PONIROS, within a few weeks of the job posting, selectively hired two mid-20s, US-born technologists with significantly less experience—one with only one year and the other with just a few months, neither of whom had any previous ties to the organization.

80. PONIROS had previously expressed an intent to prioritize "younger and qualified" candidates, openly revealing a discriminatory hiring strategy that favored youth over experience and merit.

81. Throughout Defendant PONIROS's tenure, a pattern of discrimination emerged, including terminating older, immigrant employees, refusing to hire qualified foreign-born professionals, and favoring younger, US-born hires. Notably, over 15 individuals hired by PONIROS were US-born, predominantly in their mid-20s, contrasting sharply with the treatment of older, foreign-born staff, including the Plaintiff.

82. In September 2019, Defendant PONIROS directed the student to conduct a vascular exam without the mandated presence of a registered sonographer, breaching accreditation requirements and compromising patient safety.

83. Plaintiff BRIKMAN raised concerns to Defendant PONIROS about the policy violation and the associated risks, which were summarily ignored, and the student was instructed to proceed with the exam.

84. Acting under Defendant PONIROS's orders, the student had to access patient data using the logins of Plaintiff BRIKMAN and another younger, U.S.-born colleague, a measure taken out of necessity to maintain continuity of patient care.

85. In a sequence of retaliatory measures, upon information and belief, Defendant PONIROS then acted to document evidence of the login usage by taking photographs of the computer screens displaying the credentials of Plaintiff BRIKMAN and his colleague.

86. Upon information and belief, Defendant PONIROS then approached the younger colleague in the corner of the hallway and instructed him to change his password immediately, and signaled for secrecy by placing her index finger over her lips while cautioning "shhh keep it a secret, and don't tell anyone."

87. Defendant PONIROS then changed Plaintiff BRIKMAN's schedule for the foreseeable future and reassigned all his upcoming scheduled patients to the other departments and instructed Ryan to come in to work early on the following day to preempt Plaintiff BRIKMAN's scheduled hours.

88. Subsequently, Defendant PONIROS lodged a complaint against Plaintiff BRIKMAN to labor relations and VP, Defendant FRIED, selectively omitting similar actions by others, further manifesting discriminatory intent.

89. The meeting concluded without the anticipated dismissal of Plaintiff BRIKMAN, leading to visible distress for PONIROS, who then upon information and belief, retracted her earlier directive for the younger, US-born colleague to alter his work hours.

90. Defendant PONIROS's conduct, including forcing a student to perform vascular procedures without the presence of a registered vascular technologist, in flagrant violation of accreditation and safety protocols, and covertly planning for Plaintiff BRIKMAN's replacement, exemplified a deliberate and malicious pattern of conduct.

91. The contrast in Defendant PONIROS's treatment of Plaintiff BRIKMAN to that of younger, US-born technicians who faced no repercussions for similar conduct, starkly highlights the discriminatory and retaliatory nature of PONIROS's actions, unequivocally contributed to the creation of a hostile and oppressive work environment, which significantly exacerbated the Plaintiff's mental distress.

92. On September 05, 2019, Defendant PONIROS further retaliated against Plaintiff BRIKMAN by denying him the professional courtesy to participate during his grandmother's medical exam, under the unfounded claim of a "conflict of interest.

93. This act of retaliation by Defendant PONIROS, contrasting sharply with the leniency she afforded herself for similar personal circumstances, underscores a pattern of biased and vindictive behavior directed at Plaintiff BRIKMAN.

94. In or around December 2019, Defendant PONIROS executed a discriminatory campaign against Oksana, a foreign-born technologist over 50 with a vision impairment. Upon information and belief, PONIROS's actions compelled Oksana, under the threat of termination, to choose between her health and her job, coercing her into submitting a two-week notice under distress.

95. Oksana, later empowered with knowledge of her ADA rights and seeking to rescind her two-week notice, was upon information and belief obstructed in her efforts, leading to a forced and discriminatory termination of her employment.

96. On or about March 2, 2020, Defendant PONIROS excluded Plaintiff BRIKMAN from communication regarding a significant work relocation at MHRH, directly impacting him. In stark contrast, PONIROS informed all other team members, none of whom were scheduled to work at the new location. Despite recent interactions with PONIROS, Plaintiff only learned of the move days before from an external source, highlighting PONIROS's discriminatory and retaliatory actions towards Plaintiff.

97. In May 2020, Defendant PONIROS assigned Plaintiff BRIKMAN to work in a new examination room at MHRH that lacked essential medical equipment and supplies.

98. Plaintiff BRIKMAN, following established protocols and with Manager Yasmine Ali's assistance, equipped the room for patient care. However, upon reporting to Defendant PONIROS that the room had only one network port, already in use by a computer, and that temporarily unplugging it was necessary for sending ultrasound images and completing reports, PONIROS responded with reprimands and yelling.

99. Defendant PONIROS then enforced an unreasonable and oppressive directive upon Plaintiff BRIKMAN, mandating that he could not leave or clock out until all daily reports were completed. This directive was made particularly onerous as PONIROS concurrently denied BRIKMAN access to essential tools and resources needed to fulfill these tasks.

100. This untenable situation, exacerbated by Defendant PONIROS's verbal aggression and irrational demands, created an intensely hostile work environment. This not only caused significant mental distress to Plaintiff BRIKMAN but also severely hindered his ability to fulfill his professional duties.

101. Upon information and belief, Ali, a foreign-born cardiology office manager over 60 years of age, who had assisted Plaintiff BRIKMAN with setting up the new office and actively opposed Defendant PONIROS's discriminatory conduct, subsequently faced demeaning treatment and undue stress from Defendant PONIROS and her director Maxwell. This demeaning treatment had continued for several months until Ali was abruptly terminated by Maxwell. This sequence of events suggests a pattern of retaliatory behavior within the organization, further contributing to the hostile work environment experienced by Plaintiff BRIKMAN and his older, foreign-born colleagues.

102. In August 2020, Plaintiff BRIKMAN, during an exhaustive 10.5-hour shift without a lunch break, briefly stepped outside for a much-needed break at 3:40 pm, having informed the front desk. However, within minutes, Defendant PONIROS called, accusatorily questioning Plaintiff's whereabouts and alleging he was 'wandering around,' demanding his immediate return.

103. This unwarranted intrusion by Defendant PONIROS, immediately followed by a check from her office mate upon Plaintiff BRIKMAN's return, exemplifies a targeted and coordinated effort to unduly monitor and control his movements during his short, legitimate breaks.

104. This relentless oversight by Defendant PONIROS not only intensified BRIKMAN's physical fatigue but also inflicted considerable mental strain, violating his right to a harassment-free workplace and impacting his overall well-being.

105. On December 3rd, 2020, Plaintiff BRIKMAN, experiencing a severe worsening of radiculopathy, sought permission to depart work one hour early the following day for a crucial medical appointment, at a time when no patient appointments were scheduled. Defendant PONIROS, in a clear violation of ADA provisions for reasonable accommodation, denied this request without any legitimate justification, displaying overt hostility and disregard for Plaintiff's serious health condition.

106. Defendant PONIROS's refusal to accommodate a necessary medical appointment for Plaintiff BRIKMAN, who was experiencing significant health challenges, directly contributed to a worsening of his physical and psychological condition. This denial not only amplified BRIKMAN's suffering but also exemplified a blatant indifference to his ADA-protected rights, exacerbating his medical condition and further entrenching the hostile work environment.

107. On December 3rd, 2020, Defendant PONIROS continued a pattern of harassment by issuing hostile warnings to Plaintiff BRIKMAN over a matter for which she was directly responsible and had previously failed to rectify. The series of emails illustrated PONIROS's consistent neglect of duty and her attempt to shift blame onto Plaintiff, exacerbating the already hostile work environment and further contributing to the campaign of retaliation against him.

108. Subsequent to a December 8th, 2020, phone conversation with Mirtil regarding the persistent discrimination and hostility in the workplace, Plaintiff BRIKMAN was assured of a follow-up that Mirtil failed to execute, thereby neglecting her responsibilities and continuing the pattern of inaction towards BRIKMAN's grievances.

109. In or around January 2020, Defendant Gawronski joined the team at WESTCHESTER MEDICAL and was thereafter designated as Plaintiff BRIKMAN's direct supervisor.

110. On August 31st, 2021, Plaintiff BRIKMAN, exercising his FMLA rights, requested a modified work schedule to work from the Valhalla office near his grandmother's rehabilitation facility, where staffing was adequate. Despite the feasibility and coworker support for this request, Defendant PONIROS offered only extreme options: a full leave of absence or a grueling, 4-hour daily commute to distant offices, displaying a punitive stance.

111. Due to Defendant PONIROS's punitive response, Plaintiff BRIKMAN was compelled to seek intervention from Human Resources to address this unjust treatment.

112. Contrary to Plaintiff BRIKMAN, upon information and belief, younger, U.S.-born colleagues, not involved in protected activities pertaining to workplace discrimination, were not subjected to similar adverse treatment in their requests for workplace accommodations. Specifically, colleagues of a younger age and U.S. origin were granted favorable working conditions by Defendant PONIROS, such as the option to work flexible days at preferred locations.

113. On September 21st, 2021, the director of Labor Relations, Mirtil, informed Plaintiff BRIKMAN that his modified FMLA schedule was to begin on September 27th, 2021, at the Valhalla location. Plaintiff BRIKMAN promptly communicated this information to Defendant GAWRONSKI to ensure all relevant parties were aware of the approved changes in his work schedule.

114. On September 27th, 2021, upon Plaintiff BRIKMAN's return to the Valhalla office from his month-long FMLA leave, he was aggressively confronted by Defendant PONIROS. In a blatant display of physical intimidation, PONIROS stood mere inches from Plaintiff, invading his personal space in a threatening manner. Her voice was not only raised unjustly but also carried a tone of command and hostility. Poniros sharply ordered Plaintiff BRIKMAN to shut off his machine immediately and demanded, in an authoritative and menacing tone, that he follow her to her office right away. This incident was not only deeply unsettling but also exemplified a pattern of behavior where Defendant PONIROS consistently used her physical presence and tone of voice to intimidate and belittle Plaintiff, contributing significantly to the creation of a hostile and fear-driven work environment.

115. Defendant PONIROS proceeded to berate Plaintiff BRIKMAN, unilaterally asserting control over his work hours and location. This action was taken despite the schedule being previously approved by the Labor Relations Director, Mirtil. Furthermore, Defendant PONIROS was fully aware of Plaintiff BRIKMAN's return, as he had previously notified Defendant GAWRONSKI, who in turn had informed PONIROS.

116. Escalating the hostile behavior, Defendant PONIROS then informed Plaintiff BRIKMAN that he lacked authorization to be in the building and menacingly threatened to have him forcibly removed by security. This action not only demonstrated an abusive exercise of power but also constituted a clear form of harassment, creating an environment of fear and intimidation in the workplace. This action was not only an abusive misuse of power by PONIROS but also a clear and direct form of harassment targeted at the Plaintiff. It significantly intensified Plaintiff's sense of vulnerability and fear, further exacerbating the already hostile and intimidating work environment he was subjected to.

117. On that same day, Plaintiff BRIKMAN promptly reported PONIROS's behavior to Mitchell and Christina Brennan in the labor relations department, both via text and phone, underlining the persistent pattern of retaliation and harassment he endured.

118. These actions by Defendant PONIROS not only significantly exacerbated the already hostile work environment but also inflicted considerable mental distress on Plaintiff BRIKMAN.

119. On September 29th, 2021, while on family FMLA leave and facing distress from Defendant PONIROS's actions, Plaintiff BRIKMAN responsibly notified PONIROS about his inability to attend work.

120. Defendant PONIROS, in a highly unusual response, rapidly escalated the matter of Plaintiff BRIKMAN's FMLA leave-related absence to Defendant FRIED (BRIKMAN's Vice President since late 2018), Mirtil (Director of Labor Relations), and another labor relations official.

121. This action significantly deviated from the organization's standard procedures and norms for handling employee absences.

122. Upon information and belief, the response of Defendant PONIROS to Plaintiff BRIKMAN's FMLA leave-related absence presents a stark contrast to her handling of similar situations involving younger, U.S.-born colleagues who had not engaged in protected activities. This difference in treatment indicates a clear case of disparate and discriminatory actions by PONIROS.

123. The immediate and distinct reporting approach adopted by Defendant PONIROS in response to Plaintiff BRIKMAN's FMLA leave-related absence, as compared to her treatment of other colleagues under similar circumstances, demonstrates a hostile and retaliatory work environment. This suggests a pattern of discrimination against Plaintiff BRIKMAN for exercising his FMLA rights and seeking accommodations.

124. In early October 2021, Plaintiff BRIKMAN discovered he was systematically excluded from a critical training opportunity, which involved out-of-state travel and was specifically communicated to his younger, US-born colleagues without disabilities. This omission, despite his eligibility, underscored a discriminatory bias against Plaintiff due to his age, national origin, and disability, in clear violation of workplace equality norms.

125. On October 6th, 2021, Plaintiff BRIKMAN met with Director of Labor Relations, Mirtil, to address ongoing retaliation and harassment by Defendant PONIROS including a punitive work schedule requiring Plaintiff to cover exceptionally distant offsites, unlike any other employee.

126. During this meeting, Plaintiff BRIKMAN underscored the urgency for rectification, citing the substantial mental and physical stress this unjust schedule was inflicting.

127. During this meeting, Plaintiff BRIKMAN raised the issue of unequal workplace accommodations as compared to his US-born colleagues. He specifically pointed out being denied an hour of downtime each morning and before departure, a privilege consistently afforded to everyone else not involved in protected activities.

128. During this meeting, Plaintiff BRIKMAN referenced a summer, 2021 phone call with Defendants GAWRONSKI and PONIROS, where PONIROS explicitly refused to grant BRIKMAN the same work accommodations as other team members. This refusal included the option of a four-day work week, which PONIROS denied to Plaintiff even if he were to formally request it, evidencing a clear discriminatory stance against him based on his protected activities and status.

129. During this Plaintiff BRIKMAN emphasized to Mirtil that these incidents were not isolated but indicative of a continuous, pervasive pattern of mistreatment, including retaliation, discrimination, and microaggressions, all contributing to a hostile work environment and significant anxiety.

130. During this meeting, Plaintiff BRIKMAN underscored the necessity of investigating the wrongful termination of senior, foreign-born, hearing impaired, cardiology physician Dr. Ghai Prem, who reportedly had his patient's medical record report falsified by Defendant PONIROS which resulted in his termination.

131. At the conclusion of this meeting, Mirtil agreed to further discuss these matters in a future meeting with Defendant FRIED.

132. Upon information and belief, there were significant concerns among Plaintiff's colleagues about Defendant FRIED's perceived maternal relationship with PONIROS, casting doubts on her impartiality in dealing with these matters.

133. At the conclusion of the meeting with Mirtil, Plaintiff BRIKMAN was pressured by Mirtil to work additional hours despite being on a modified FMLA schedule, violating the terms of his arrangement and exploiting his situation.

134. Following the meeting with Mirtil, Plaintiff BRIKMAN informed an echo supervisor, about his meeting with HR and provided a detailed summary to Defendant GAWRONSKI, highlighting ongoing workplace discrimination and retaliation issues.

135. After Plaintiff BRIKMAN communicated his interaction with HR to Defendant PONIROS, Poniros immediately engaged in harassment and retaliation against Plaintiff BRIKMAN for his participation, stating that Plaintiff should not have done so and warned him to be ready.

136. Defendant PONIROS then proceeded to dispute the validity of Plaintiff BRIKMAN's scheduled HR meeting, erroneously claiming it lacked her prior approval and thus did not justify his late clock-out. This unfounded challenge by PONIROS exemplified her ongoing pattern of harassment and retaliation, markedly intensifying the hostile work environment and further exacerbating Plaintiff's mental distress.

137. On October 8th, 2021, Defendant PONIROS, perpetuating a retaliatory and hostile environment, emailed Defendant FRIED and Mirtil, along with another labor relations member, to report Plaintiff's two instances of working late, notably including his HR meeting.

138. Defendant PONIROS then imposed a standard on Plaintiff BRIKMAN's overtime work, stating that any overtime not deemed legitimate by her would be disregarded.

139. Plaintiff BRIKMAN, unconcerned about the overtime itself, did not contest this stance.

140. In early October 2021, Plaintiff BRIKMAN uncovered critical information regarding Dr. Ghai's wrongful termination from a firsthand witness – the initial author of a report purportedly falsified by Defendant PONIROS, leading to Dr. Ghai's dismissal. This discovery significantly heightened BRIKMAN's anxiety, necessitating increased vigilance in his reporting duties to avoid similar unjust outcomes. Subsequently, Plaintiff informed Poniros of his practice of working off-duty to ensure the accuracy of his reports, a proactive measure aimed at preventing further wrongful dismissals.

141. In response, Defendant PONIROS imposed a strict policy requiring Plaintiff BRIKMAN to be clocked in for all work-related activities, irrespective of their location.

142. On October 19, 2021, Plaintiff BRIKMAN, adhering to an agreement with Defendant GAWRONSKI, worked beyond modified FMLA hours and was then harassed from Defendant PONIROS for this action.

143. On October 22, 2021, Defendant PONIROS misrepresented the circumstances of Plaintiff BRIKMAN's work hours in email communications. This was contrary to the facts known and previously acknowledged by Defendant GAWRONSKI, who had recorded the specific agreed-upon dates in his pocket notepad yet failed to corroborate Plaintiff BRIKMAN's adherence to their mutual agreement.

144. These actions by Defendants PONIROS and GAWRONSKI represent a concerted retaliatory effort, disregarding established agreements and exacerbating the hostile work environment and mental strain on Plaintiff BRIKMAN.

145. On October 22, 2021, Plaintiff BRIKMAN met with Mirtil and Defendant FRIED to specifically address concerns regarding discrimination and retaliation within the workplace.

146. Contrary to the intended purpose, the meeting deviated significantly, characterized by a defensive stance from Mirtil and Defendant Fried, and a notable avoidance of the central issues raised by BRIKMAN.

147. During this meeting, in direct conflict with VP Marie Yezzo's 2018 instruction for Plaintiff BRIKMAN to report discrimination to Mirtil, Defendant FRIED expressly forbade such communication and subtly warned against upsetting PONIROS, who was indicated to be in line for a higher role. This action by FRIED not only undermined established reporting protocols but also served to intimidate Plaintiff BRIKMAN.

148. In this meeting, Mirtil confronted Plaintiff BRIKMAN about exceeding his FMLA hours on October 6th and criticized him for clocking out late. This confrontation ignored the fact that their scheduled work-related meeting on that day, dedicated to discussing workplace discrimination and hostile work environment, was the very reason for BRIKMAN's late clock-out.

149. This action by Mirtil, disregarding the context of the previous meeting, not only underscored the organization's ongoing pattern of retaliation and indifference towards genuine workplace discrimination concerns but also epitomized the pervasive, hostile environment that Plaintiff was forced to endure.

150. In their meeting, despite Plaintiff BRIKMAN providing substantial evidence of the organization's bias against those with sincerely held beliefs, Mirtil reacted with unexpected dismay upon receiving these concerns. Inconsistently, Mirtil directed Plaintiff to channel future complaints to another HR department, contradicting her designated role by the leadership as the appropriate point of contact for such matters.

151. This response from Mirtil, neglecting the responsibilities of her position, exemplified the organization's reluctance to confront and address issues of workplace discrimination.

152. On November 2, 2021, the cumulative effects of a hostile work environment imposed by BRIKMAN's superiors led to a near-fatal car accident. This incident was a direct result of severe anxiety and sleep deprivation, a direct consequence of the ongoing harassment and a vindictive work schedule.

153. The situation was exacerbated by discrimination related to Dr. Ghai's wrongful termination and Plaintiff BRIKMAN's awareness of possibly being the next target by Defendant PONIROS based on his nationality, age, and perceived disability, as well as facing additional retaliation for reporting such discrimination.

154. On November 3, 2021, Plaintiff BRIKMAN notified Defendant GAWRONSKI about arriving late, and upon reaching work, directly communicated to Defendant PONIROS the details of a severe car accident he had the previous day, linking its cause to acute anxiety and sleep deprivation caused by ongoing workplace hostility and the punitive work schedule enforced upon him.

155. Upon hearing Plaintiff BRIKMAN's explanation of a severe car accident caused by workplace-induced anxiety, Defendant PONIROS smirked dismissively and stated that Plaintiff's anxiety was "causing a problem for the department," and instructed Plaintiff to "deal with it".

156. This interaction only served to heighten Plaintiff BRIKMAN's anxiety and underscored the inherent nature of the hostile work environment to which he was being regularly subjected.

157. Later that day, On November 3, 2021, Plaintiff BRIKMAN continued to face heightened hostility and retaliation from Defendant PONIROS when PONIROS denied Plaintiff's travel expense reimbursements for July and August. It is important to note that Poniros had previously approved Plaintiff's identical travel and expense reimbursements from March to June of that year (co-signed by Defendant GAWRONSKI).

158. The timing of this denial strongly suggested that Defendant PONIROS's actions were not only retaliatory but also a direct consequence of Plaintiff BRIKMAN's increased advocacy against workplace discrimination.

159. On November 4-5, 2021, Plaintiff BRIKMAN took sick days due to the distress from the near-fatal incident on 11/02/2021, which had exacerbated his severe anxiety and sleep deprivation.

160. On November 8, 2021, Plaintiff BRIKMAN, adhering to a previously arranged schedule, arrived at New Windsor, 1.5 hours from his home, unaware of a last-minute schedule change to work in nearby Valhalla; this update, sent via email during BRIKMAN's absence following a near-fatal incident, was not communicated to him by Defendant GAWRONSKI, breaking the usual protocol of verbal or text notification.

161. Defendant GAWRONSKI, aware of Plaintiff BRIKMAN's recent near-fatal incident and ongoing severe anxiety, willfully disregarded a reasonable accommodation for plaintiff to remain in New Windsor which had a busy schedule, and instead instructed him to travel over an hour to Valhalla—where the office was already adequately staffed and did not require additional personnel. GAWRONSKI's decision to neglect a practical alternative and the well-being of Plaintiff BRIKMAN only served to exacerbate the hostile work environment and intensified Plaintiff's anxiety and distress.

162. On November 8, 2021, during his journey from New Windsor to Valhalla, Plaintiff BRIKMAN, experiencing severe anxiety and drowsiness due to a recent near-fatal incident, had to make a critical safety stop. The rural area's limited network coverage hindered his ability to communicate this situation immediately, underscoring the grave health challenges BRIKMAN faced.

163. On the same day of November 8th, upon return to Valhalla, Plaintiff BRIKMAN was confronted with an unexpected email from Defendant PONIROS that challenged BRIKMAN's one hour overtime for the day of his traumatic incident of November 2nd, and this matter was escalated to the Vice President Defendant FRIED, which deviated from established norms.

164. In an unusual deviation from standard practice, Defendant PONIROS challenged Plaintiff BRIKMAN's one-hour overtime from November 2nd, despite BRIKMAN having consistently worked similar overtime periods throughout the previous year under his punitive schedule without such challenges. This action by PONIROS represented a departure from the routine handling of overtime matters within the organization.

165. The immediate escalation of inquiries about Plaintiff BRIKMAN's overtime to Defendant FRIED marked a stark contrast in treatment when compared to younger, U.S.-born colleagues. These colleagues, who had not engaged in protected activities nor required ADA accommodations, did not face similar high-level scrutiny for comparable

actions. This differential treatment of BRIKMAN suggests a pattern of targeted discriminatory and retaliatory behavior, further contributing to the hostile work environment.

166. Defendant PONIROS's sudden transition from her early October 2021 stance—approving only overtime she viewed as legitimate, an approach unopposed by Plaintiff BRIKMAN—to her aggressive monitoring and questioning of BRIKMAN's work hours, particularly for the day of his traumatic incident, exhibited a distinct and intentional contradiction which exacerbated the hostile work environment and significantly heightening BRIKMAN's anxiety and mental distress.

167. During a meeting on November 8th, 2021, involving Plaintiff BRIKMAN and Defendants FRIED and GAWRONSKI, FRIED acknowledged prior instances of miscommunications but minimized their importance, labeling them as "no big deal."

168. In the same meeting, FRIED issued a directive to GAWRONSKI, instructing him to ensure BRIKMAN is directly informed of any last-minute schedule changes, whether in person, by phone, or via text.

169. In a meeting with Defendant FRIED, Plaintiff BRIKMAN emphatically reiterated his request for ADA accommodations. He specifically sought a reasonable modification of his work schedule to either 36 hours weekly or a part-time arrangement. This request included a provision for balanced workdays across various office locations, a measure necessary to minimize direct interaction with Defendant PONIROS, the main contributor to his escalating workplace anxiety. Additionally, Plaintiff BRIKMAN requested a reassignment of reporting structure to avoid direct supervision by Defendant PONIROS. These accommodations were essential for managing his health conditions, as substantiated by medical advice, while ensuring his continued effective performance of job duties.

170. In the course of the meeting, Plaintiff BRIKMAN underscored allegations of pervasive workplace discrimination, emphatically urging an immediate investigation into the wrongful termination of Dr. Ghai, an elderly, hearing-impaired, foreign-born employee, aged over 70.

171. During the meeting, Defendant FRIED acknowledged reviewing Plaintiff BRIKMAN's prior emails, which detailed allegations of discriminatory conduct by Defendant PONIROS. Despite the serious nature of these allegations, FRIED opted to dismiss them entirely, demonstrating a clear bias in favor of PONIROS.

172. Upon information and belief, Defendant PONIROS has continually escaped accountability for her pattern of retaliatory and discriminatory conduct. The absence of reprimand for her actions has not only emboldened a hostile workplace culture but also inflicted a corrosive impact on Plaintiff BRIKMAN's psychological well-being.

173. Plaintiff BRIKMAN informed both Defendants, FRIED and GAWRONSKI during this meeting about his consultation with legal counsel due to the retaliatory and discriminatory work environment.

174. In a post-meeting communication with Defendant GAWRONSKI, Plaintiff BRIKMAN comprehensively outlined pervasive discriminatory practices within the organization, exemplified by the coerced resignations of employees over 40 and foreign-born, alongside the notable wrongful termination of Dr. Ghai Prem, precipitated by medical record falsifications by Defendant PONIROS. Plaintiff detailed his personal hardships arising from insufficient ADA accommodations, emphasizing his acute struggle with intensified anxiety and insomnia, and underscored his heightened vulnerability to retaliatory termination under PONIROS's targeted discriminatory conduct.

175. On or about November 11, 2021, Plaintiff BRIKMAN emailed Defendant FRIED, detailing pervasive harassment and discrimination in the workplace, highlighting the mistreatment of a vascular student and the retaliatory discrimination against his colleague, Monique. This email also detailed BRIKMAN's urgent need for time off due to personal health challenges.

176. Upon information and belief, Plaintiff BRIKMAN notes the retaliatory actions against his colleague, Monique, which mirror the pattern of discrimination and retaliation within the organization. Monique, after functioning in a management role for four months, sought official recognition of her promotion through labor relations. Contrarily, in a retaliatory response, Maxwell demoted her, reassigning her to a front desk position. This demotion, occurring around September 2021, immediately following her attempt to secure official recognition of her managerial role, demonstrated the organization's punitive approach towards employees who assert their professional rights. Such actions contributed to the overall hostile work environment, effectively deterring employees from engaging in protected activities due to the fear of facing similar retaliation. This environment further reinforces the culture of retaliation and discrimination experienced by Plaintiff BRIKMAN and his peers.

177. On November 17th, 2021, Plaintiff BRIKMAN was subjected to unlawful retaliation after his recent disclosure of protected activities. This retaliation was manifest in the form of a counseling note containing distortions of previously resolved events, which blatantly contradicted factual records and Plaintiff's account.

178. In a counseling note issued by Defendant FRIED, punitive measures were unjustly imposed on Plaintiff BRIKMAN for allegedly attending work exhibiting COVID-19 symptoms on October 6, 2021, which was the day of Plaintiff's critical meeting with Labor Relations. This meeting, conducted to discuss ongoing workplace discrimination and harassment, particularly by Defendant PONIROS, was a protected activity under anti-discrimination laws. The baseless COVID-19 accusation, exemplified the Defendants' ongoing pattern of retaliation and discriminatory behavior. These acts were not isolated incidents but part of a concerted effort to penalize and intimidate Plaintiff BRIKMAN for his efforts to address and rectify the discriminatory practices within the workplace.

179. Furthermore, the counseling note encompassed a retaliatory response to a health-related emergency experienced by Plaintiff BRIKMAN on November 8, 2021. On this date, Plaintiff, facing severe anxiety and health issues exacerbated by the hostile work environment, was forced to make a critical emergency stop during his commute. Despite the acknowledged lack of network service preventing immediate communication of this situation, Defendant FRIED imposed punitive measures against Plaintiff for this necessary stop. This enforcement, requiring Plaintiff BRIKMAN to choose between compromising his immediate health and safety or facing punitive consequences, blatantly disregarded the known health challenges of Plaintiff and further entrenched the pattern of retaliatory and discriminatory treatment he endured. This action by Defendant FRIED and the broader context of Defendants' behavior towards Plaintiff BRIKMAN demonstrate a clear violation of his rights under anti-discrimination and labor laws, contributing to a hostile and untenable work environment."

180. By disregarding necessary accommodations for Plaintiff BRIKMAN's documented anxiety, Defendant FRIED's actions violated ADA provisions, significantly worsening Plaintiff's mental distress and intensifying a hostile work environment.

181. In the same meeting, Plaintiff BRIKMAN was coerced into signing a document obligating them to attend Employee Assistance Program (EAP) counseling for anxiety and headaches, directly linked to the discriminatory work environment. The scheduling of the initial counseling session post-dated Plaintiff's wrongful termination by only two days, starkly revealing the employer's superficial commitment to addressing the underlying issues and further cementing the discriminatory practices faced by Plaintiff.

182. On November 19th, 2021, Defendant GAWRONSKI, blatantly disregarded directives from Defendant FRIED by failing to inform Plaintiff BRIKMAN of a critical schedule change, exacerbating the hostile work environment and Plaintiff's mental distress.

183. In late November, Plaintiff BRIKMAN informed Defendant GAWRONSKI of his impending request for FMLA leave due to escalating anxiety and insomnia, awaiting his physician's return. In response, GAWRONSKI sought to dissuade him, citing potential impacts on workload, despite acknowledging the schedule was notably light at that time due to the approaching winter holidays. This dismissive and coercive behavior by GAWRONSKI blatantly disregarded Plaintiff's serious health issues and his legal entitlement to FMLA leave, exacerbating an already hostile work environment and significantly aggravating Plaintiff's mental distress.

184. Following Plaintiff's communication about FMLA leave, Defendant GAWRONSKI began a distinct pattern of retaliatory conduct against Plaintiff BRIKMAN. This included an immediate and heightened scrutiny of Plaintiff's work, unwarranted disciplinary measures, and ultimately led to Plaintiff's wrongful termination.

185. On November 30, 2021, a further instance of coordinated retaliation occurred. A subordinate of Defendant PONIROS sent an email to GAWRONSKI with fabricated claims about Plaintiff BRIKMAN. GAWRONSKI, deviating from normal procedures, escalated this false information to senior management (Defendants FRIED and PONIROS) instead of seeking clarification from Plaintiff. GAWRONSKI's later admission of the falsity of these claims further highlights the retaliatory and arbitrary nature of these actions.

186. As a Vascular Technologist, Plaintiff BRIKMAN's responsibilities included performing ultrasounds and managing exam reports, the latter constituting nearly 40% of his duties. To comply with management's directives and to alleviate his severe morning anxiety, Plaintiff adapted his workflow by starting these report-related tasks through audio recordings after clocking in, optimizing both his well-being and work efficiency.

187. On December 1st, 2021, at 7:10 am, Plaintiff BRIKMAN discussed with Defendant GAWRONSKI his necessary strategy to manage severe anxiety, a condition notably worsened by recurrent operational issues at the employee parking lot. Plaintiff's meticulously tailored approach involved effectively utilizing his morning downtime to audio review work reports post clock-in while having his vehicle parked within the hospital premises. This 7-minute routine was not merely a matter of personal convenience; it was essential for maintaining Plaintiff's mental well-being and ensuring his continued engagement with principal job responsibilities. Despite the nominal time investment and its profound impact on the Plaintiff's well-being and work engagement, Defendant Gawronski mandated the cessation of this critical practice. Compliance with this instruction not only stripped Plaintiff Brikman of a minimal yet key workplace accommodation but also led to a significant exacerbation of Plaintiff's severe anxiety.

188. In the same conversation, Defendant GAWRONSKI inquired about Plaintiff BRIKMAN's intent to apply for FMLA leave. Upon Plaintiff's affirmative response, GAWRONSKI abruptly concluded the conversation, neglecting to offer any further dialogue or reasonable accommodations. Within an hour of this exchange, GAWRONSKI escalated the situation by disseminating a skewed report of the circumstances to Defendants PONIROS and FRIED, thus endorsing and perpetuating their discriminatory agenda. This rapid escalation, in the context of Plaintiff's compliance and the essential nature of his anxiety management practice, demonstrated a clear pattern of discriminatory and retaliatory conduct against Plaintiff, reinforcing the hostile work environment he was subjected to.

189. Subsequently, Defendant PONIROS conducted a biased investigation into Plaintiff BRIKMAN's clock-in times, immediately sharing these findings with Mirtil via email. This investigation ignored BRIKMAN's diligent performance of principal duties and focused solely on clock-in times.

190. During a meeting on December 3rd, 2021, with Defendant FRIED and Mirtil, Plaintiff BRIKMAN was subjected to unwarranted scrutiny for utilizing a brief period for anxiety management, a stark contrast to the leniency extended to younger, US-born colleagues who were not engaged in similar protected activities.

191. In this meeting, Plaintiff BRIKMAN raised a pivotal inquiry with Defendant Fried and Mirtil, seeking clarification on the categorization of the time spent managing his severe anxiety – whether it should be officially recognized as a morning break or a legitimate reasonable workplace adjustment under the provisions of employment law. This inquiry was not only critical for establishing the formal status of Plaintiff's anxiety management practice but also served as a test of the employer's commitment to adhering to legal standards pertaining to workplace accommodations. Despite the significance of this inquiry in the context of Plaintiff's rights under federal employment law, both Defendant Fried and Mirtil failed to engage in dialogue on the matter. Their collective failure to address this crucial question demonstrated a concerning indifference to Plaintiff's request for clarity on his rights and accommodations, further evidencing a pattern of discriminatory attitude and a disregard for mandated workplace adjustments for employees with documented medical conditions.

192. On December 7th, 2021, Plaintiff BRIKMAN uncovered a discriminatory pattern in professional development opportunities when he learned that Defendant GAWRONSKI had exclusively informed younger, US-born colleagues, who did not have disabilities, about essential training sessions that were set to take place. Despite the direct relevance to his role, Plaintiff was deliberately kept uninformed, only learning of the training inadvertently.

193. Shortly thereafter, on December 8, 2021, as a final act of discrimination and retaliation, Defendant WESTCHESTER MEDICAL terminated Plaintiff's employment citing "time theft". Mirtil and Defendant FRIED - a key individual in the complaint, was notably present during this termination meeting, highlighting her integral role in the decision-making process. In stark contrast to this treatment, younger, US-born colleagues not engaged in protected activities or in need of ADA or FMLA accommodations, were not subjected to similar scrutiny or disciplinary actions.

194. In a clear demonstration of discriminatory practices, Mirtil, a younger, U.S.-born employee, faced no disciplinary action for conducting work-related activities while driving, an act she deemed permissible. Conversely, Plaintiff BRIKMAN, engaging in similar tasks, was discriminatorily accused of 'time theft' and terminated. This disparate treatment, regardless of their different roles, starkly highlights systemic discrimination within the organization based on age, national origin, and disability status.

195. Upon information and belief, the termination of Plaintiff BRIKMAN for 'time theft' was a pretextual reason, concealing discriminatory motives based on his age, national origin, actual and perceived disability, and in retaliation for engaging in protected activities, including requests for medical accommodations and FMLA rights.

196. When Plaintiff BRIKMAN attempted to contest the 'time theft' accusation, he was informed that the decision was predetermined, indicative of a biased and predetermined agenda against him, contrary to the treatment shown to younger, US-born colleagues, who neither sought accommodations nor reported protected activities, yet regularly engaged in personal activities during work hours without disciplinary repercussions. Unlike these colleagues, Plaintiff, who utilized similar or less time managing anxiety while fulfilling work duties, faced the extreme consequence of termination.

197. Notably, upon information and belief, Plaintiff BRIKMAN, a 40-year-old Ukrainian-origin employee, was replaced with a mid-20s, US-born individual for the Vascular Technologist position.

198. Plaintiff BRIKMAN was unlawfully discriminated and retaliated against, humiliated, and degraded.

199. As a result of the acts and conduct complained of herein, Plaintiff BRIKMAN suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

200. As a result of the acts and conduct complained of herein, Plaintiff BRIKMAN further experienced severe emotional and physical distress.

201. Defendants' actions and conduct were intentional and intended to harm Plaintiff BRIKMAN.

202. As a result of the above, Plaintiff BRIKMAN has been damaged in an amount which exceeds the jurisdiction limits of the Court.

203. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff BRIKMAN demands punitive damages as against all Defendants, jointly and severally.

204. Throughout his tenure at Westchester Medical Center, Plaintiff BRIKMAN's work performance and general well-being were significantly impeded by his health conditions. He suffered from severe anxiety, leading to prolonged insomnia, frequent headaches, excessive worry, and concentration challenges, all of which impacted his ability to effectively execute his work responsibilities. Concurrently, his diagnosed cervical stenosis caused recurrent cervical radiculopathy episodes, characterized by chronic neck pain, restricted neck mobility, and arm weakness and numbness. Despite these challenges, and his explicit communication of these health issues to his employer, the necessary accommodations as required under the Americans with Disabilities Act (ADA) were not provided. This lack of accommodation not only exacerbated his health conditions but also undermined his work performance, contributing to an increasingly hostile work environment and the deterioration of Plaintiff BRIKMAN's mental and physical health.

### FIRST CAUSE OF ACTION
### <u>HOSTILE WORK ENVIRONMENT UNDER (TITLE VII, ADEA, ADA, FMLA)</u>
(Against All Defendants)

205. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint.

206. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 to 634, Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213, and the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654 for relief based upon the unlawful employment practices of the above-named Defendants.

207. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e–2(a) by discriminating against Plaintiff because of his national origin (Ukrainian):

    It shall be an unlawful employment practice for an employer—

    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or **national origin**; or

    (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or **national origin**.

208. Defendants engaged in unlawful employment practices prohibited by 29 U.S.C. § 623(a) by discriminating against Plaintiff because of his age (Plaintiff was born in July, 1981):

    It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **age**;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's **age**.

209. Defendants engaged in unlawful employment practices prohibited by 42 U.S. Code § 12112 by discriminating against Plaintiff because of his disability (Cervical stenosis and Severe anxiety):

42 U.S.C. § 12112(a): No covered entity shall discriminate against a qualified individual on the basis of **disability** in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(b): As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes—

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the **disability** of such applicant or employee

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a **disability** who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

210. Defendants engaged in unlawful employment practices prohibited by Title VII, ADEA, ADA by discriminating against Plaintiff and subjecting him to a hostile work environment because of his national origin, age, and disability. This was perpetuated by Defendants PONIROS, GAWRONSKI, and FRIED through discriminatory practices, refusal to provide necessary accommodations and retaliation including wrongful termination.

211. Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

## SECOND CAUSE OF ACTION
## DISCRIMINATORY TERMINATION UNDER (TITLE VII, ADEA, ADA, FMLA)
(Against All Defendants)

212. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint.

213. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 to 634, Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213, and the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654, for relief based upon the unlawful employment practices of the above-named Defendant WESTCHESTER MEDICAL.

214. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e–2(a) by discriminating against Plaintiff because of his national origin (Ukrainian):

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or **national origin**; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or **national origin**.

215. Defendants engaged in unlawful employment practices prohibited by 29 U.S.C. § 623(a) by discriminating against Plaintiff because of his age (Plaintiff was born in July, 1981):

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **age**;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's **age**.

216. Defendants engaged in unlawful employment practices prohibited by 42 U.S. Code § 12112 by discriminating against Plaintiff because of his disability (Cervical stenosis and Severe anxiety):

42 U.S.C. § 12112(a): No covered entity shall discriminate against a qualified individual on the basis of **disability** in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(b): As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes—

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the **disability** of such applicant or employee

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a **disability** who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

217. Defendants engaged in unlawful employment practices prohibited by Title VII, ADEA, ADA, FMLA by discriminating against Plaintiff by terminating his employment on the basis of his national origin, age, disability, reporting discrimination, and seeking necessary medical accommodations.

218. Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

### THIRD CAUSE OF ACTION
### <u>NATIONAL ORIGIN DISCRIMINATION UNDER TITLE VII</u>
(Against All Defendants)

219. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint.

220. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., for relief based upon the unlawful employment practices of the above-named Defendants.

221. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e–2(a) by discriminating against Plaintiff because of his national origin (Ukrainian):

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or **national origin**; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or **national origin**.

222. Defendants engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff because of his national origin.

223. Plaintiff Brikman contends that his Ukrainian origin was a basis for ongoing discriminatory treatment which culminated in the wrongful termination of the Plaintiff's employment. This was perpetuated by Defendants through derogatory remarks and discriminatory practices.

224. Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

### FOURTH CAUSE OF ACTION
### <u>AGE DISCRIMINATION UNDER ADEA</u>
(Against All Defendants)

225. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint.

226. This claim is authorized and instituted pursuant to the provisions of Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 to 634, for relief based upon the unlawful employment practices of the above-named Defendants.

227. Defendant WESTCHESTER MEDICAL engaged in unlawful employment practices prohibited by 29 U.S.C. § 623(a) by discriminating against Plaintiff because of his age (Plaintiff was born in July, 1981):

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **age**;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's **age**.

228. Defendants engaged in unlawful employment practices prohibited by ADEA by discriminating against Plaintiff because of his age, which culminated in the wrongful termination of the Plaintiff's employment. This was perpetuated by Defendants through discriminatory practices, and derogatory remarks.

229. Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

**FIFTH CAUSE OF ACTION**
**<u>DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE UNDER ADA</u>**
(Against All Defendants)

230. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint.

231. This claim is authorized and instituted pursuant to the provisions of Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213, for relief based upon the unlawful employment practices of the above-named Defendants.

232. Defendants engaged in unlawful employment practices prohibited by 42 U.S. Code § 12112, 42 U.S.C. § 12203 by discriminating against Plaintiff because of his disability (Cervical stenosis and Severe anxiety):

233. 42 U.S.C. § 12112 provides that:

(a): No covered entity shall discriminate against a qualified individual on the basis of **disability** in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b): As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes—

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the **disability** of such applicant or employee

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a **disability** who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

234. 42 U.S.C. § 12203 provides that:

(a) No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

235. Plaintiff, while employed at Westchester Medical Center, suffered from severe anxiety and cervical stenosis, conditions that significantly limited his major life activities, as recognized under the Americans with Disabilities Act (ADA). His anxiety manifested in chronic symptoms including insomnia, persistent headaches, excessive worry, and difficulty concentrating, severely impairing his daily functioning. Concurrently, the cervical stenosis resulted in frequent flare-ups of cervical radiculopathy, causing chronic neck pain, substantial difficulty in moving the neck, and debilitating weakness and numbness in his arm. These conditions necessitated specific accommodations, as defined under ADA, to enable him to perform his job duties effectively. Despite Plaintiff's clear communication of his disabilities and need for accommodations, the Defendants failed to provide such, directly violating ADA's accommodation requirements.

236. Defendants engaged in unlawful employment practices prohibited by ADA by discriminating against Plaintiff because of his disability, which culminated in the wrongful termination of the Plaintiff's employment.

237. Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

**SIXTH CAUSE OF ACTION**
**RETALIATION UNDER (TITLE VII, AEDA, ADA)**
(Against All Defendants)

238. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint.

239. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

240. Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(d) provides that:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

241. Americans with Disabilities Act of 1990, 42 U.S.C. § 12203 provides that:

> (c) No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> (b) It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her

having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

242. Defendants violated the sections cited herein as set forth through, among other things, unlawfully terminating Plaintiff as a result of his good faith complaints of discrimination and hostile work environment.

243. Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff BRIKMAN has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**SEVENTH CAUSE OF ACTION**
**<u>INTERFERENCE UNDER FMLA</u>**
(Against All Defendants)

244. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

245. This claim is instituted pursuant to the provisions of the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654, particularly under 29 U.S.C. § 2615(a)(1), which makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA.

246. 29 U.S. Code § 2615 provides that:

(a)(1) It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(a)(2) It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

(b) It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual—

(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

(2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

247. Upon information and belief, Plaintiff and Defendant WESTCHESTER MEDICAL are subject to the FMLA, respectively, as eligible employee and covered employer.

248. Defendants interfered with Plaintiff's rights under the FMLA by terminating Plaintiff in response to Plaintiff's clearly communicated intention to apply for FMLA leave due to escalating anxiety, insomnia, and headaches.

249. Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**EIGTH CAUSE OF ACTION**
**DISCRIMINATION UNDER THE NYSHRL**
(Against All Defendants)

250. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein at length.

251. New York State Executive Law § 296(a) provides that:

It shall be an unlawful discriminatory practice: "For an employer or licensing agency, because of an **individual's age**, race, creed, color, **national origin**, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, **disability**, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

252. New York State Executive Law § 296(e) provides that:

It shall be an unlawful discriminatory practice: "For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

253. New York State Executive Law § 296 3(a) provides that:

It shall be an unlawful discriminatory practice: "For an employer, licensing agency, employment agency or labor organization to refuse to provide reasonable accommodations to the known disabilities, or pregnancy-related conditions, of an employee, prospective employee or member in connection with a job or occupation sought or held or participation in a training program."

254. In light of the Plaintiff's medical conditions, the Defendant's failure to provide necessary accommodations, and subsequent heightened scrutiny of the Plaintiff's performance starkly contrasted with the treatment of other employees. Despite his diligent efforts to maintain a high standard of work, even under the debilitating effects of his anxiety and cervical stenosis, the Plaintiff was unduly reprimanded and discriminated against, while his US-born, younger colleagues who did not suffer from such disabilities or request accommodations, were not subjected to similar treatment.

255. Defendants violated the sections cited herein as set forth and have engaged in discriminatory acts against the Plaintiff, which include, but are not limited to, the termination of the Plaintiff's employment.

256. Accordingly, as a result of Defendants unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**NINTH CAUSE OF ACTION**
**HOSTILE WORK ENVIRONMENT UNDER THE NYSHRL**
(Against All Defendants)

257. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein at length.

258. New York State Executive Law § 296 (a) provides that:

> It shall be an unlawful discriminatory practice: "For an employer or licensing agency, because of an **individual's age**, race, creed, color, **national origin**, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, **disability**, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

259. New York State Executive Law § 296(e) provides that:

> It shall be an unlawful discriminatory practice: "For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

260. Defendants engaged in an unlawful discriminatory practice by subjecting Plaintiff to a hostile work environment because of his age, national origin, disability, and for opposing discriminatory practices.

261. The persistent nature of this hostile environment, exacerbated by retaliatory actions such as unwarranted disciplinary measures and ultimately the wrongful termination of Plaintiff's employment, underscores the severity and impact of Defendants' unlawful actions.

262. Accordingly, as a result of Defendants unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**TENTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYSHRL**
(Against All Defendants)

263. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein at length.

264. New York State Executive Law § 296(e) provides that:

> It shall be an unlawful discriminatory practice: "For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

265. New York State Executive Law § 296(7) provides that:

> It shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any

practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

266. Defendants violated the sections cited herein as set forth and have engaged in retaliatory acts against the Plaintiff, which include, but are not limited to, the termination of the Plaintiff's employment.

267. Accordingly, as a result of Defendants unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**ELEVENTH CAUSE OF ACTION**
**DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE UNDER THE NYSHRL**
(Against All Defendants)

268. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein at length.

269. New York State Executive Law § 296(a) provides that:

It shall be an unlawful discriminatory practice: "For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, **disability**, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

270. New York State Executive Law § 296 3(a) provides that:

271. It shall be an unlawful discriminatory practice: "For an employer, licensing agency, employment agency or labor organization to **refuse to provide reasonable accommodations to the known disabilities**, or pregnancy-related conditions, of an employee, prospective employee or member in connection with a job or occupation sought or held or participation in a training program."

272. Plaintiff, while employed at Westchester Medical Center, suffered from severe anxiety and cervical stenosis, conditions that significantly limited his major life activities. His anxiety manifested in chronic symptoms including insomnia, persistent headaches, excessive worry, and difficulty concentrating, severely impairing his daily functioning. Concurrently, the cervical stenosis resulted in frequent flare-ups of cervical radiculopathy, causing chronic neck pain, substantial difficulty in moving the neck, and debilitating weakness and numbness in his arm. These conditions not only hampered his ability to perform his job effectively but also necessitated specific workplace accommodations, which were denied.

273. Defendants violated the sections cited herein as set forth and have engaged in discriminatory acts against the Plaintiff, who suffers from recognized disabilities. These acts include, but are not limited to, the wrongful termination of Plaintiff's employment, a decision that egregiously disregarded his known disabilities.

274. Accordingly, as a result of Defendants unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**TWELFTH CAUSE OF ACTION**
<u>**DISCRIMINATORY TERMINATION UNDER THE NYSHRL**</u>
(Against All Defendants)

275. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein at length.

276. New York State Executive Law § 296(a) provides that:

It shall be an unlawful discriminatory practice: "For an employer or licensing agency, because of an **individual's age**, race, creed, color, **national origin**, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, **disability**, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

277. New York State Executive Law § 296(e) provides that:

It shall be an unlawful discriminatory practice: "For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

278. New York State Executive Law § 296 3-a. (a) provides that:

It shall be an unlawful discriminatory practice: "For an employer or licensing agency to refuse to hire or employ or license or to bar or to terminate from employment an individual eighteen years of age or older, or to discriminate against such individual in promotion, compensation or in terms, conditions, or privileges of employment, because of such individual's age."

279. Defendants engaged in an unlawful discriminatory practice by terminating Plaintiff's employment, motivated by his age, national origin, and disability, and in direct retaliation for Plaintiff BRIKMAN's opposition to discriminatory practices.

280. The timing and circumstances of the termination suggest a direct link to Plaintiff's protected characteristics and activities.

281. Accordingly, as a result of Defendants unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**THIRTEENTH CAUSE OF ACTION**
<u>**AGE DISCRIMINATION UNDER THE NYSHRL**</u>
(Against All Defendants)

282. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein at length.

283. New York State Executive Law § 296(a) provides that:

It shall be an unlawful discriminatory practice: "For an employer or licensing agency, because of an **individual's age**, race, creed, color, national origin, citizenship or immigration status, sexual orientation,

gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

284. New York State Executive Law § 296 3-a. (a) provides that:

It shall be an unlawful discriminatory practice: "For an employer or licensing agency to refuse to hire or employ or license or to bar or to terminate from employment an individual eighteen years of age or older, or to discriminate against such individual in promotion, compensation or in terms, conditions, or privileges of employment, because of such individual's age."

285. Defendants engaged in an unlawful discriminatory practice by terminating Plaintiff's employment, motivated by his age.

286. Accordingly, as a result of Defendants unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

## FOURTEENTH CAUSE OF ACTION
## NATIONAL ORIGIN DISCRIMINATION UNDER THE NYSHRL
(Against All Defendants)

287. Plaintiff BRIKMAN repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein at length.

288. New York State Executive Law § 296(a) provides that:

It shall be an unlawful discriminatory practice: "For an employer or licensing agency, because of an individual's age, race, creed, color, **national origin**, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

289. Defendants engaged in an unlawful discriminatory practice by terminating Plaintiff's employment, motivated by his national origin.

290. Accordingly, as a result of Defendants unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

## FIFTEENTH CAUSE OF ACTION
## HARASSMENT UNDER THE NYSHRL
(Against All Defendants)

291. Plaintiff BRIKMAN repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

292. New York State Executive Law § 296(h) provides that:

It shall be an unlawful discriminatory practice: "For an employer, licensing agency, employment agency or labor organization to subject any individual to harassment because of an **individual's age**, race, creed,

color, **national origin**, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, **disability**, predisposing genetic characteristics, familial status, marital status, status as a victim of domestic violence, or because the individual has **opposed any practices forbidden under this article** or because the individual has **filed a complaint**, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. The fact that such individual did not make a complaint about the harassment to such employer, licensing agency, employment agency or labor organization shall not be determinative of whether such employer, licensing agency, employment agency or labor organization shall be liable. Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared. It shall be an affirmative defense to liability under this subdivision that the harassing conduct does not rise above the level of what a reasonable victim of discrimination with the same protected characteristic or characteristics would consider petty slights or trivial inconveniences."

293. Defendants violated the section cited herein as set forth and have engaged in harassment against the Plaintiff, based on his age, national origin, disability, reporting and opposing discriminative practices.

294. Accordingly, as a result of Defendants unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**SIXTEENTH CAUSE OF ACTION**
**AIDING AND ABETTING UNDER THE NYSHRL**
(Against Defendants PONIROS, GAWRONSKI, FRIED)

295. Plaintiff BRIKMAN repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

296. New York State Executive Law § 296(6) provides that:

It shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

297. Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

298. Accordingly, as a result of the unlawful conduct of Defendants (PONIROS, GAWRONSKI, FRIED), Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**JURY DEMAND**

299. Plaintiff BRIKMAN requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff respectfully requests a judgment against the Defendants:

A. A declaratory judgment that the practices complained of are in violation of Title VII, AEDA, ADA, FMLA, and NYSHRL.

B. An injunction and order preventing Defendants from continuing their discriminatory and retaliatory practices.

C.   Awarding damages to Plaintiff Brikman for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make his whole for any losses suffered as a result of such unlawful employment practices;

D.   Awarding Plaintiff Brikman compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

E.   Awarding Plaintiff Brikman punitive damages;

F.   Awarding Plaintiff Brikman legal fees, costs, and expenses associated with pursuing this action; and

G.   Awarding Plaintiff Brikman such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: December 8, 2023
Bronx, New York

By:     Igor Brikman, Pro Se
        2410 Barker Ave, APT 13C
        Bronx, NY 10467
        (917) 873-1438
        Igor_Brikman@yahoo.com